UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Kelsey, Petty and Senior Judge Annunziata
Argued at Chesapeake, Virginia

ROBERT ANTHONY MURRAY

MEMORANDUM OPINION[*] BY
v.        Record No. 1137-12-1                JUDGE ROSEMARIE ANNUNZIATA
APRIL 23, 2013

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Marc Jacobson, Judge Designate

Jason A. Dunn (Jones, Jones & Dunn, PLC, on brief), for appellant.

Elizabeth C. Kiernan, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Robert Anthony Murray (appellant) appeals his misdemeanor conviction of embezzlement

in violation of Code § 18.2-111.  On appeal, appellant contends the trial court erred in denying his

motion to suppress statements he made to police officers.  Appellant argues the statements were

obtained and used against him at trial in violation of his constitutional rights and the holding of the

United States Supreme Court in Garrity v. New Jersey, 385 U.S. 493 (1967).  Finding no error, we

affirm the conviction.

BACKGROUND

In reviewing a trial court's ruling on a motion to suppress, this Court views the evidence

in the light most favorable to the prevailing party, the Commonwealth in this instance, and

considers the "evidence adduced at both the trial and suppression hearing."  Greene v.

Commonwealth, 17 Va. App. 606, 608, 440 S.E.2d 138, 139 (1994).

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Viewed in this light, the evidence proved that on July 2, 2009, the Portsmouth Police Department executed a search warrant in conjunction with an investigation of an alleged illegal gambling operation at "Lucky Dog Sweepstakes." Pursuant to the search warrant, the police seized a number of items found on the premises, including a Vizio flat-screen television (hereinafter, "the TV"). Subsequently, the case involving Lucky Dog Sweepstakes was dropped, resulting in the return to Lucky Dog Sweepstakes of all the seized property with the exception of the TV, which could not be located. The seized property had been stored in a facility maintained by the Tactical Response Unit (TRU) of the Portsmouth police.

On September 17, 2010, Sergeant T. Thursby, a supervising officer of TRU, sent a series of text messages to all TRU officers, including appellant, stating that the TV must be located and returned or an official investigation would follow. Thursby's final text message stated "no questions [would be] asked" when the TV was returned.

When Lieutenant Donald Butler, one of appellant's superior officers, arrived at the police department for work on September 20, 2010, he observed the TV had been returned to one of the offices at TRU. Butler was informed that appellant had brought in the TV. When Butler asked appellant where the TV had been, appellant told Butler, "It's here, it's in the office." When Butler asked who had the TV before it was returned, appellant said he thought no questions were to be asked. When Butler asked the question again, appellant asked if he was required to answer. Butler responded that appellant either could answer him or he "was going to answer to them," pointing to the building that housed the Professional Standards Unit (PSU), the internal affairs division of the police department. Butler's response was intended to inform appellant that an investigation would be launched if he did not answer Butler's question. Appellant thereupon

identified a former Portsmouth police officer, by the name of "Riddle," as the individual who had had the TV.[1]

Butler testified that his conversation with appellant was not part of an administrative investigation and that appellant was not in custody at the time. Butler explained his questions as an attempt to satisfy his curiosity about the TV's location before its return. Once appellant identified Riddle as the individual who had had the TV, Butler asked no further questions. Butler explained that the officer was "no longer with [the police force], so it really didn't concern [him]." According to Butler, pursuant to police department policy, appellant would have been subject to discipline, ranging from an oral reprimand to dismissal, for refusing to answer Butler's question. However, Butler did not tell appellant that the failure to answer questions would result in his dismissal or suspension.

On November 9, 2010, the chief of the Portsmouth Police Department authorized an internal investigation by PSU regarding the disappearance of the TV. On November 12, 2010, Detective J.D. Thomas, the PSU officer leading the investigation, emailed a "Rights and Responsibilities" letter to appellant, as well as to a number of other individuals. The letter stated that an administrative investigation was being conducted and it set forth the departmental policy on interviews conducted during such investigations.

The policy states that "[a]n employee may be ordered to answer questions that are related to their duties or fitness. Failure to answer such questions may be the basis for disciplinary action."[2] The departmental policy also sets forth an employee's rights during an administrative investigation, stating, in relevant part:

---

[1] A police officer named Riddle was the applicant for the search warrant for the premises of Lucky Dog Sweepstakes.

[2] Thomas testified that discipline for not answering questions during an investigation could range from administrative sanction to dismissal.

> The employee shall truthfully and completely answer all questions pertaining to the investigation, either verbally or in writing. Refusal to truthfully and completely answer these questions shall be grounds for disciplinary action and may result in dismissal from the department. While an employee has the right to remain silent and not incriminate him or herself in a criminal proceeding, the employee's silence or refusal to answer questions during an administrative investigation will be deemed insubordination, and will result in discipline, which may result is dismissal from the department in accordance with Garrity v. New Jersey, 385 U.S. 493 (1967).
>
> . . . [A]nswers given by an employee during the investigation of an administrative matter will not be used against that employee in any criminal proceedings.

The email advised appellant to contact Thomas at PSU to schedule a formal interview.

On November 14, 2010, appellant called Thursby to discuss the pending administrative investigation. Appellant told Thursby he intended to inform PSU that he had the TV before it was returned. Thursby advised appellant to first tell Lieutenant Wright, one of the supervisors at TRU.

On the morning of November 15, 2010, appellant telephoned Lieutenant Larry Jacobs, who was both a personal friend and the commanding officer of PSU. Appellant told Jacobs he had learned of the investigation regarding the TV and that, according to his supervisor, no questions would be asked if the TV was returned. Appellant admitted he had taken the TV, pointing out he had returned it. Appellant told Jacobs that he believed "it was common practice and normal to use equipment out of the police department." Jacobs did not ask appellant any questions during the telephone conversation or indicate any penalties that appellant would face, including whether he would be fired or suspended, if he failed to answer the questions asked during the investigation. Jacobs, however, reiterated the requirement that appellant meet with

- 4 -

Thomas and provide an official statement of the occurrence.[3] Subsequently, Jacobs relayed the substance of his conversation with appellant to the Virginia State Police, whose investigation of the incident resulted in appellant's indictment for felony embezzlement, in violation of Code § 18.2-111.[4]

DISCUSSION

Appellant argues on appeal that the police obtained his statements on September 20, November 14, and November 15, 2010 in violation of his Fifth Amendment rights and that the trial court erred in denying his motion to suppress them. "The burden is on the defendant to show that the denial of his suppression motion, when the evidence is considered in the light most favorable to the Commonwealth, was reversible error." McCain v. Commonwealth, 261 Va. 483, 490, 545 S.E.2d 541, 545 (2001).

Specifically, appellant contends that on September 20, 2010 Butler submitted him to questioning regarding the missing TV under the potential threat of economic sanction, namely dismissal from employment. Thus, he asserts, his admission of knowledge that Riddle had had the TV was coerced, and his admission resulted in the administrative investigation that ensued. Appellant further claims his statements on November 14, 2010 to Thursby and on November 15, 2010 to Jacobs were derived from his initial statement to Butler and that they, likewise, were inadmissible in the criminal proceedings brought against him.

_____

[3] Appellant met with Thomas on November 15, 2010. In Thomas' presence, appellant signed the "Rights and Responsibilities" letter he had received by email. At appellant's trial, the Commonwealth introduced no evidence obtained during appellant's interview with Thomas. Nor did Thomas provide the Virginia State Police officers who investigated appellant for embezzlement with the contents of the statement appellant made during the November 15, 2010 interview with Thomas.

[4] At trial, appellant was found not guilty of felony embezzlement, but guilty of misdemeanor embezzlement in violation of Code § 18.2-111. He was sentenced to six months in jail, all suspended, conditioned on one year of good behavior. He also was fined $500, with $250 suspended.

In relevant part, the Fifth Amendment provides that no individual "shall be compelled in any criminal case to be a witness against himself." The Fifth Amendment, which is made applicable to the states by the Fourteenth Amendment, see J.D. v. Commonwealth, 42 Va. App. 329, 339, 591 S.E.2d 721, 726 (2004), not only establishes "a person's right not to testify when one is a defendant in a criminal trial but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answer might incriminate him in future criminal proceedings.'" Id. (quoting Lefkowitz v. Turley, 414 U.S. 70, 77 (1973)).

In support of his argument, appellant relies primarily upon the Supreme Court's decision in Garrity, in which New Jersey police officers were questioned during an official investigation of allegations of fraudulent conduct. Before the questioning, the officers were advised of their Fifth Amendment right to not answer questions, but were informed that any refusal to answer would result in their dismissal. Inculpatory statements from some of the officers were later admitted in criminal prosecutions against them. See Garrity, 385 U.S. at 495. The Court concluded that the Fifth Amendment privilege against coerced statements "prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." Id. at 500.

Subsequent to Garrity, United States Supreme Court opinions have held that the Fifth Amendment was violated when the suspect's statements were coerced by the threat of an economic sanction. See Gardner v. Broderick, 392 U.S. 273, 279 (1986); Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation, 392 U.S. 280, 283-84 (1968). However, in the case law progeny of Garrity,

> there are two common features: (1) the person being investigated is
> explicitly told that failure to waive his constitutional right against

self-incrimination will result in his discharge from public employment (or a similarly severe sanction imposed in the case of private citizens); and (2) there is a statute or municipal ordinance mandating such procedure.

United States v. Indorato, 628 F.2d 711, 716 (1st Cir. 1980).

We conclude that appellant's September 20, 2010 statement to Butler identifying another officer as the individual who had had the TV was not coerced by an explicit threat of discharge or other economic sanction, and thus does not fall under the protective cloak of Garrity. At the time of the September 20 conversation, Thursby had advised the members of TRU that the TV had to be returned, and it was. Having learned of the return of the TV, Butler, one of appellant's supervisors, asked appellant where the TV had been. Appellant asserts on appeal that Butler's implication that appellant would have to answer to PSU if he did not respond to Butler's questions catalyzed his admission that he had knowledge of where the TV had been and the name of the perpetrator. However, Butler's questions did not include a threat to remove appellant from office or impose any sanction whatsoever. In short, appellant was not presented with a choice of either answering Butler's questions or losing his job and livelihood. To be sure, although a possibility existed that an investigation of the incident would be instituted if appellant failed to answer Butler's questions regarding the TV, no investigation had been launched at the time of the questioning.

Furthermore, the prospect of being the named subject of an investigation was not, in itself, sufficient to bring any admissions appellant made at that time within the ambit of the Garrity principles. A criminal defendant's "subjective concern that he might receive some disciplinary action is not sufficient to prove that state action coerced or compelled him to answer questions against his will." J.D., 42 Va. App. at 341, 591 S.E.2d at 727.

Finally, as appellant recognizes, an investigation would not necessarily have resulted in the imposition of an economic penalty or sanction any greater severity than an oral reprimand.

Under these circumstances, it cannot be said that Butler exerted "'such pressure upon . . . [appellant] as to disable him from making a free and rational choice.'" Garrity, 385 U.S. at 497 (quoting Miranda v. Arizona, 384 U.S. 436, 464-65 (1966)).[5]

Having concluded appellant's September 20, 2010 statement was not obtained as a result of unlawful police coercion, we need not consider appellant's arguments that his subsequent statements to Thursby and Jacobs were inadmissible because they were derived from a primary illegality. Appellant does not argue, and we do not consider, whether the statements to Thursby and Jacobs were otherwise inadmissible because they were produced under coercion by the police subsequent to appellant's September 20, 2010 encounter with Butler or because they were involuntary.[6]

## CONCLUSION

For the foregoing reasons, we find the trial court did not err in denying appellant's motion to suppress. We affirm appellant's conviction.

Affirmed.

---

[5] Indeed, appellant's belief that it was common practice for police officers to use items or equipment that had been seized by the police lends further credence to the conclusion that he did not make his statement to Butler under coercion.

[6] Defense counsel conceded at oral argument that appellant made the November 14 statement voluntarily.